CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

March 23, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **ANGELA TAYLOR,** | ) | |
| Plaintiff | ) | Civil Action No. 1:25cv00040 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **FRANK J. BISIGNANO,** | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Angela Taylor, ("Taylor"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

is "substantial evidence."''" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Taylor protectively filed an application for DIB[1] on December 15, 2021, alleging disability as of March 24, 2021, based on lower back problems, depression, nerves and high blood pressure. (R. at 17, 218-19, 254.) The claim was denied initially and upon reconsideration. (R. at 128-29, 134-35.) Taylor then requested a hearing before an administrative law judge, ("ALJ"), which was held on May 16, 2024, at which she was represented by counsel. (R. at 38-70, 137.)

By decision dated June 10, 2024, the ALJ denied Taylor's claim. (R. at 17-31.) The ALJ found Taylor met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2023. (R. at 19.) At the hearing, Taylor

---

[1]   Taylor previously filed an application for DIB on May 21, 2019, alleging disability beginning March 31, 2017. (R. at 74.) By decision dated March 26, 2021, the ALJ denied her claim. (R. at 74-88.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("A.R.") 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 142361 (Aug. 1, 1991). Pursuant to A.R. 00-1(4), the ALJ must consider prior ALJ findings using factors articulated in *Albright* such as (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period under consideration in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim. *See* A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938.

The ALJ in this case correctly articulated the *Albright* standard when analyzing the prior ALJ decision. The ALJ afforded significant weight to the prior opinion because the record continued to support a light residual functional capacity, but, overall, Taylor continued to receive conservative care with few objective abnormalities and typically had normal gait, station, mood and affect, orientation and other findings. (R. at 28.)

amended the alleged onset date to August 3, 2021.[2] (R. at 17.) The ALJ found Taylor had not engaged in substantial gainful activity from August 3, 2021, the amended alleged onset date, through the date last insured. (R. at 19.) The ALJ determined Taylor had severe impairments, namely, lumbar degenerative disc disease, status post fusion; obesity; carpal tunnel syndrome; depression; and anxiety, but he found she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-22.) The ALJ found Taylor had the residual functional capacity to perform light[3] work, except she could never climb ladders, ropes or scaffolds; she could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; she could frequently balance; she could not work around hazards, such as unprotected moving mechanical parts or exposed high places; she could not work on vibrating surfaces or with vibrating tools or machinery; she could understand, remember and carry out simple instructions; she could not perform work requiring a specific production rate, such as assembly line work or work that required hourly quotas; she could occasionally interact with others; and she required the ability to sit for two hours during the workday. (R. at 22-23.)  The ALJ found Taylor was unable to perform any of her past relevant work.  (R. at 29.)  Based on Taylor's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Taylor could perform, including those of a folder, a bagger and a sorter.  (R. at 30.)  Thus, the ALJ concluded that Taylor was not under a disability as defined by the Act from August 3,

---

[2] Therefore, Taylor must show she was disabled between August 3, 2021, the amended alleged onset date, through September 30, 2023, the date last insured, to be eligible for DIB benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. § 404.1567(b) (2025).

2021, through the date last insured, and she was not eligible for DIB benefits. (R. at 31.) *See* 20 C.F.R. § 404.1520(g) (2025).

After the ALJ issued his decision, Taylor pursued her administrative appeal, (R. at 216-17), but the Appeals Council denied her request for review. (R. at 1-6.) Taylor then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2025). This case is before this court on Taylor's brief, filed October 8, 2025, and the Commissioner's brief, filed December 31, 2025.

## *II. Facts*[4]

Taylor was born in 1971, (R. at 29), which, at the time of her alleged onset date, classified her as a "younger person" under 20 C.F.R. § 404.1563(c), but as a "person closely approaching advanced age," under 20 C.F.R. § 404.1563(d), on the date last insured.  She testified that she has a high school education and past work experience as a pharmacy technician.  (R. at 48, 55-56.)  Taylor said she lived with her husband and mother, who helped with the household chores, because her back would hurt within 15 minutes of starting chores. (R. at 49.) She said if she was working on a chore where she had to bend over, such as the dishes, she would experience pain in her lower back that radiated down her left leg. (R. at 49-50.) Taylor said the pain and tingling in her back improved with surgery, but had started up again in the last few years. (R. at 59.) She said she took over-the-counter medications for the pain. (R. at 60.) Taylor said she could stand or walk for 15 minutes at a time before she would need to rest for 30 minutes to an hour. (R. at 50.)

---

[4] Because Taylor's arguments on appeal are limited to her physical impairments, the undersigned will appropriately limit the recitation of facts and analysis to the same. To the extent Taylor's other impairments are discussed, it is for background or context.

She said she could sit in a kitchen chair for about 30 minutes to an hour before she would need to get up and move around. (R. at 50.) Taylor said she had a driver's license and could drive for about an hour before she would need to take a break and stretch. (R. at 51.) Taylor grocery shopped for the household, but she only went to the store when there were not a lot of people. (R. at 52.) She said, when she went grocery shopping, her back would start hurting by the time she entered the store, and she could lift 10 pounds at most. (R. at 53.) Taylor said she could not remember the plot of a one-hour television show, and she had to make notes for herself to remember things. (R. at 54-55.) She said she did not participate in hobbies outside of the home. (R. at 55.) Taylor said she treated with a nurse practitioner for mental health and depression related to her son's death, and she was prescribed medications. (R. at 56-58.) She said she slept six hours per night. (R. at 58.)

George Starosta, a vocational expert, also was present and testified at Taylor's hearing. (R. at 61-70.) Starosta testified that Taylor had past relevant work as a pharmacy technician, performed at a medium[5] exertional level. (R. at 61-62.) He testified, among other things, that a hypothetical individual of Taylor's age, education and work experience, who could perform light work, but who could never climb ladders, ropes or scaffolds; who could occasionally climb ramps and stairs and stoop, kneel, crouch and crawl; who could frequently balance; who could not work around hazards such as exposed high places or unprotected moving mechanical parts; who could not work with vibrating tools or machinery or on vibrating surfaces; who could understand, remember and carry out simple instructions; who could not perform work requiring specific production rates such as assembly line work or work that might require hourly quotas; and who could only occasionally interact with

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2025).

others, could not perform Taylor's past work. (R. at 62-63.) However, he testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a hand folder, a cleaner and a laundry linen sorter. (R. at 63.) When asked to assume the same individual, but who was required to sit two hours during the workday, Starosta stated this restriction would eliminate the cleaner job, but such an individual could perform work as a bagger. (R. at 65.) Starosta testified that the tolerance for off-task behavior would be up to 15 percent across the workday or if the off-task time occurs in larger chunks of time, like an additional break, only five percent of the workday, and the tolerance for absenteeism would be two days per month for three months in a row. (R. at 66-67.) Starosta stated that his testimony was consistent with the Dictionary of Occupational Titles, ("D.O.T."), with the exception of his testimony regarding absences, time off task, the different types of climbing, the definition of simple work, and the limitations on interacting with others, which was based on his experience and knowledge of how jobs are performed in the labor market. (R. at 67-68.)

In rendering his decision, the ALJ reviewed records from Jonesville Family Health Center; Stone Mountain Health Services; Family First Medical; Lee County Community Hospital; Southern Medical Group; Highlands Neurosurgery; Watauga Orthopedics; Ballad Health Medical Associates; Howard Leizer, Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Leslie Montgomery, Ph.D., a state agency psychologist; and Dr. William Humphries, Jr., M.D., a state agency physician.

On April 15, 2019, Taylor saw Dr. Jody Helms, M.D., at Highlands Neurosurgery, for a surgical consultation. (R. at 396-98.) Taylor reported a history of spondylolysis with spondylolisthesis since 2011, which had been managed conservatively with NSAIDS, muscle relaxers and epidural injections. (R. 396.) A

recent injection on March 15 had offered no improvement, and the intensity of her pain continued to increase. (R. at 396.) Taylor reported severe pain that radiated from the lumbar spine into the left lower extremity down to her foot. (R. at 396.) A magnetic resonance imaging, ("MRI"), study from January 2019 showed L5 spondylolysis with grade 2 spondylolisthesis with severe neuroforaminal stenosis, worse on the left, with compression of the L5 nerve root and a small central L4 disc bulge. (R. at 396.) Given the MRI findings, Dr. Helms recommended surgery. (R. at 396.) On April 16, 2019, Taylor underwent an L5-S1 posterior lumbar interbody fusion surgery. (R. at 393.) She was discharged from the hospital two days later. (R. at 390.) At the time of discharge, Taylor was awake, alert and oriented; her motor function was intact in both legs; she had intact sensation in both legs; and she was ambulating unassisted. (R. at 390.) On April 29, 2019, Taylor saw Brian Killen, P.A., a physician assistant at Highlands Neurosurgery, for follow up and staple removal two weeks after her surgery. (R. at 389.) Taylor reported doing well and she said that her left lower extremity pain had resolved. (R. at 389.) Killen encouraged her to remain active with walking and stretching. (R. at 389.) On May 30, 2019, Taylor saw Christopher Justus, P.A., a physician assistant at Highlands Neurosurgery, for a six-week follow up from back surgery. (R. at 386.) Justus noted that Taylor had done remarkably well, with resolution of her lower extremity radiculopathy and minimal lumbar pain. (R. at 386.) On physical examination, Taylor's incision was well-healed without signs of infection; she had symmetric strength and intact sensation; she had right calf tenderness without erythema or edema; and her gait was within normal limits. (R. at 386.) An x-ray showed a stable spinal fusion. (R. at 386, 388.) Justus recommended that Taylor increase activity as tolerated, but not to lift more than 25 pounds. (R. at 386.)

On July 25, 2019, Taylor saw Killen for a three-month follow up after her back surgery. (R. at 383.) Taylor reported that her back pain and leg pain were much

improved. (R. at 383.) Taylor reported pain on the bottom of her feet when weight bearing, which Killen attributed to plantar fasciitis, for which Taylor was receiving treatment. (R. at 383.) On physical examination, Taylor was alert; she followed commands; she was in no acute distress; she moved all extremities; her grip was symmetrical; Hoffman's signs[6] were negative; her reflexes were slightly hypoactive throughout; her toes were downgoing; dorsiflexion and plantar flexion were intact; her gait was slightly guarded; she had no signs of spasticity or myelopathy; her cranial nerves were grossly intact; her strength was symmetrical at 4/5; and her lumbar incision was well-mended. (R. at 383.) An x-ray obtained that day showed no marked change from the previous x-ray. (R. at 385.) Killen prescribed steroids for Taylor's plantar pain. (R. at 384.) On October 28, 2019, Taylor saw Dr. Helms for follow up after her back surgery. (R. at 381.) Taylor reported mild back discomfort and some mild discomfort in her right calf. (R. at 381.) On physical examination, her incision was well-healed; she was ambulating normally; she had no significant tenderness in the back and para-incision; she had normal range of motion in the hips; straight leg raise testing was normal in both legs; sensation and motor activity were normal in both legs; and she had minimal tenderness in the right calf, but no swelling, redness or tenderness behind the knee. (R. 381.) Dr. Helms discussed stretching the right calf. (R. at 381.) An x-ray of the lumbar spine showed a stable postoperative lumbar spine. (R. at 382.)

On January 13, 2020, Taylor saw Dr. John Litton, M.D., for an annual exam. (R. at 618.) Taylor reported back pain and joint stiffness in her fingers, which had improved with back surgery, among other findings. (R. at 618-19.) On physical examination, Taylor had a normal gait; she had normal tone and muscle strength;

---

[6] A positive Hoffman's sign indicates that an individual may have damage in the upper region of the cervical spinal cord. *See* https://webmd.com/brain/what-to-know-hoffman-test (last visited March 20, 2026.)

she had no limb or joint pain with range of motion; she had no laxity or subluxation of any joints; and she had no tenderness in major joints, among other normal findings. (R. at 620.)

On May 6, 2021, Taylor saw Mona Speak, D.N.P., a nurse practitioner, for high blood pressure. (R. at 539.) On physical examination, Taylor's gait was normal, and she could walk several steps with good balance and smooth turns. (R. at 542.) Taylor was diagnosed with hypertension, generalized anxiety disorder and gastroesophageal reflux disease, ("GERD"), without esophagitis. (R. at 543.)

On August 25, 2021, Taylor saw Speak for an annual examination. (R. at 546.) Taylor denied any acute problems, although she continued to deal with depression and anxiety. (R. at 546.) Taylor endorsed independently performing all activities of daily living, including feeding, toileting, dressing, bathing, ambulating, shopping, meal preparation, housework, laundry, transportation and money management. (R. at 548.) Taylor reported back problems, but she denied joint pain, joint stiffness, muscle cramps, muscle stiffness and restricted motion and weakness, among other things. (R. at 549.) During physical examination, Taylor was able to walk several steps and turn smoothly with easy balance. (R. at 551.) On November 1, 2021, Taylor again saw Speak. (R. at 554.) During physical examination, Taylor had a normal gait and was able to walk several steps and turn smoothly, with good balance, among other unremarkable findings. (R. at 556-57.) Taylor was encouraged to do aerobic exercise to lower her blood pressure, among other things. (R. at 558.) Taylor was diagnosed with hypertension, generalized anxiety disorder, GERD and obesity. (R. at 557.) When Taylor saw Speak on February 2, 2022, she denied arthritis, back problems, joint pain, joint stiffness, muscle cramps, muscle stiffness and restricted motion and weakness, among other things. (R. at 561-62.) On physical examination,

Taylor was able to walk several steps with a normal gait, turn smoothly and balance easily, among other normal findings. (R. at 562-63.)

On March 8, 2022, Dr. Donald Williams, M.D., a state agency physician, completed a physical assessment of Taylor in connection with the initial determination of her claim. (R. at 103-04.) He opined she could perform light work, including lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking a total of six hours; sitting a total of about six hours; frequently climbing ladders, ropes and scaffolds and kneeling, crouching and crawling; occasionally stooping; and she should avoid concentrated exposure to vibration and hazards. (R. at 103-04.) Dr. Williams also stated that Taylor's impairments impacted her ability to lift, stand, reach, walk and sit, she could walk 50 to 75 feet before resting for 20 to 30 minutes, and she could lift 25 pounds, but it is unclear if Dr. Williams was merely reciting Taylor's own reported limitations, or if he was applying these limitations to Taylor's residual functional capacity.[7] (R. at 103.) Dr. Williams based his findings on Taylor's history of degenerative disc disease with lumbar spinal fusions and her recent history of normal recent physical examinations. (R. at 103-04.) On October 9, 2023, Dr. William Humphries, Jr., M.D., another state agency physician, completed a physical assessment of Taylor in connection with the reconsideration of her claim. (R. at 116-17.) His findings and reasoning mirrored those of Dr. Williams. (R. at 116-17.)

On September 14, 2022, when Taylor saw Speak, she reported independence in all activities of daily living, including feeding, toileting, dressing, bathing, ambulating, meal preparation, housework, laundry, transportation, medication and

---

[7] Taylor completed a Function Report on January 31, 2022, stating she could walk 50 to 75 feet before she needed to rest for 20 to 30 minutes, and she could not lift items over 25 pounds. (R. at 266.)

money management. (R. at 883-84.) Taylor denied back problems, joint pain, joint stiffness, muscle cramps, muscle stiffness, restricted motion and weakness. (R. at 886.) During physical examination, Taylor had a normal gait and could walk several steps and turn smoothly, with easy balance, among other normal findings. (R. at 887-88.) Taylor was diagnosed with constipation, hypertension, menopause, GERD without esophagitis, metabolic syndrome, obesity and generalized anxiety disorder. (R. at 888.) On May 10, 2023, Taylor saw Speak for high blood pressure. (R. at 873.) Taylor denied back problems, joint pain, joint stiffness, muscle cramps, muscle stiffness, restricted motion and weakness, among other things. (R. at 874.) During physical examination, Taylor had a normal gait and was able to walk several steps and turn smoothly, with easy balance, among other normal findings. (R. at 875-76.) Taylor was diagnosed with hypertension, generalized anxiety disorder, GERD, metabolic syndrome, prediabetes, irritable bowel syndrome with constipation and obesity. (R. at 877.)

On August 14, 2023, Taylor received imaging of the lumbar spine in connection with her disability claim. (R. at 905.) The x-rays showed generative and postoperative changes in the lower lumbar spine with bilateral pedicle screw placement of the L5 and S1 vertebrae with vertically oriented connecting rods; interbody prosthesis cages at the L5/S1 vertebrae; grade 1 listhesis of L5 on S1, which was unchanged dating back to at least July 25, 2019, with grossly normal alignment otherwise; a slight compression fracture deformity and slight vertebral body height loss of T11, but the lateral view was moderately rotated, making assessment limited, although it was grossly unchanged from prior exams; mild loss of disc height at L4/L5 without marked change; and mild right and left arthritic changes in the sacroiliac, ("SI"), joints; but, overall, there had not been a great deal of interval change dating back to at least July 25, 2019,  the date of the comparison image. (R. at 905.)

When Taylor saw Speak on August 23, 2023, she denied back problems, joint pain, joint stiffness, muscle cramps, muscle stiffness and restricted motion and weakness, among other things. (R. at 957.) During physical examination, Taylor had a normal gait and could walk several steps and turn smoothly, with easy balance. (R. at 958-59.)

On September 23, 2023, Taylor saw Vickie Stevens, F.N.P., a board-certified family nurse practitioner, for a consultative examination in connection with her disability claim. (R. at 962-65.) Taylor reported she hurt her back in 2011 or 2012, with her condition initially improving and then worsening. (R. at 962.) She said she had undergone back surgery, but continued to have numbness and tingling in her left leg that radiated to her foot. (R. at 962.) Taylor said she had not seen her neurosurgeon due to health insurance issues, and she had depression, for which she saw a counselor. (R. at 962.) Taylor reported taking losartan, Protonix, clonidine, fluvoxamine, BuSpar, benztropine, amitriptyline and clonazepam. (R. at 962.) Taylor endorsed fatigue, recent weight changes, double vision, claudication,[8] shortness of breath on exertion, indigestion, heat intolerance, low back pain, sensory loss, depression, anxiety and difficulty concentrating. (R. at 962.) On physical examination, Taylor was in no acute distress; she ambulated without assistance; her gait was not altered; she had decreased range of motion in the lumbar spine; she had no tenderness or edema upon palpation of the lumbar spine; she was able to rise from a sitting position without assistance; she could stand on tiptoes, heels and tandem walk without difficulty; she was able to bend and squat with difficulty; she appeared depressed, but not anxious; she was alert and oriented to time, place and situation;

---

[8] Claudication refers to pain from inadequate blood flow to the muscles during exercise. Claudication is a symptom, not a specific disease or condition, but it is most often related to narrowed arteries in the legs or arms. *See* https://www.mayoclinic.org/diseases-conditions/claudication/symptoms-causes/syc-20370952 (last visited Feb. 24, 2026).

she was cooperative with the examination; she was able to communicate with no deficits; her recent and remote memory were intact; and she had good insight and cognitive function. (R. at 963.) Taylor had a reduced range of motion in flexion, extension and lateral flexion of the lumbar spine, and full range of motion in all other areas. (R. at 964-65.) Stevens diagnosed low back pain with left radiculopathy, depression and anxiety. (R. at 964.) She opined, based on the examination and the objective evidence, that Taylor could sit, walk and/or stand for a full workday, but should avoid lifting over 10 to 15 pounds. (R. at 964.) Stevens opined Taylor could hold a conversation, respond appropriately to questions and carry out and remember instructions. (R. at 964.)

On November 21, 2023, Taylor saw Speak for follow up. (R. at 966.) Taylor reported fatigue, weight gain, high blood pressure, constipation, heartburn, excessive stress and psychiatric issues, but denied back problems, joint pain, joint stiffness, muscle cramps, muscle stiffness, restricted motion and weakness, among other things. (969-70.) During physical examination, Taylor had a normal gait and turned smoothly, with easy balance, among other normal findings. (R. at 970-72.) Speak diagnosed hypertension, GERD without esophagitis, prediabetes and generalized anxiety disorder. (R. at 972.)

On February 27, 2024, Taylor saw Dr. Helms, her neurosurgeon, for lower back and left leg pain. (R. at 976.) Taylor said she had back pain that radiated laterally down to her knee and had lasted for a year. (R. at 976.) She denied any injury or fall associated with the pain. (R. at 976.) Taylor rated the pain as seven out of 10. (R. at 976.) Dr. Helms noted that x-rays of the lumbar spine looked stable, although there was a subtle compression deformity at the T-11 vertebra, which looked chronic and was not symptomatic. (R. at 977.) Taylor was alert and oriented; she followed commands; she could move all extremities; she had equal grip strength;

strength was full and symmetrical; sensation was grossly intact; her reflexes were normal throughout; Hoffman's sign was negative; straight leg raise testing was negative; she had no foot drop; and her gait was within normal limits. (R. at 977.) Dr. Helms diagnosed lumbar region radiculopathy and low back pain, and he prescribed physical therapy and oral steroids. (R. at 977.)

On March 14, 2024, Taylor saw Robin Butler, N.P., a nurse practitioner, to establish primary care. (R. at 1041.) Taylor reported pain in her joints, especially her wrists, for which she rated the pain two out of 10 in severity. (R. at 1041.) Taylor completed a depression screening, which indicated moderately severe depression. (R. at 1044.)  Butler diagnosed hypertension, GERD, prediabetes, a history of lumbar fusion, joint pain and anxiety. (R. at 1046-47.) She referred Taylor to orthopedics for her hand pain and continued her medications. (R. at 1046-47.)

On April 8, 2024, Taylor saw Dr. Timothy Jenkins, M.D., for bilateral hand pain. (R. at 1031.) On physical examination, Taylor had mild thenar atrophy, slightly reduced strength in her thumbs, decreased sensation in the median nerve distribution, a positive Tinel's sign at the medial nerve, positive carpal compression test and positive Phalen's test, all bilaterally. (R. at 1034.) Dr. Jenkins diagnosed thoracic outlet and carpal tunnel syndromes, bilaterally. (R. at 1034.) Taylor did not feel ready for surgery, and Dr. Jenkins provided wrist braces and instructions for stretching exercises and supportive care. (R. at 1034-35.)

When Taylor saw Butler on April 11, 2024, she reported back pain and wrist pain, and she said her feet were burning. (R. at 1036, 1038.) Taylor described the pain in her wrist as aching and burning, and she rated it a and two out of 10 in severity. (R. at 1036-37.) Butler referred Taylor to cardiology for tachycardia and instructed her to keep a log of her blood pressures. (R. at 1040.)

-14-

On April 18, 2024, Taylor was admitted to the Lee County Community Hospital emergency department for chest pain. (R. at 1063.) Taylor said she had intermittent mid-sternum chest pain, tightness and burning since the previous day. (R. at 1063.) On physical examination, she had abdominal tenderness, but there were no other findings. (R. at 1064-65.) Taylor was diagnosed with gastric reflux and discharged from the emergency department. (R. at 1065.)

On May 9, 2024, Butler filled out an Assessment Of Ability To Do Work-Related Activities, in which she opined on Taylor's physical limitations. (R. at 1070-72.) Butler opined that Taylor could lift and carry a maximum of five pounds both occasionally and frequently, due to her pain, burning and numbness in her arms and hands. (R. at 1070.) Butler opined Taylor could stand and walk a total of four hours a day, due to her back pain and leg weakness. (R. at 1070.) Butler further opined Taylor could sit a total of five hours a day, due to stiffness and numbness in her lower extremities. (R. at 1071.) Butler opined Taylor could occasionally climb, kneel and balance, but never stoop, crouch and crawl, because of her back and lower extremity pain. (R. at 1071.) Butler opined Taylor could not push and pull, because her back and lower extremities would become numb and painful. (R. at 1071.) Butler opined Taylor would be unable to operate moving machinery because she could not lift, push and pull without pain. (R. at 1072.) Butler said her opinion was supported by objective medical evidence, including x-rays of the lumbar spine and prior back surgery. (R. at 1072.) Butler concluded that Taylor would be unable to work indefinitely. (R. at 1072.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2025). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2025).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider

whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Taylor argues that the ALJ's residual functional capacity determination is not supported by substantial evidence because the ALJ erred in his consideration of the medical opinions provided by Stevens, a consultative examiner, and Butler, a primary care provider Taylor began to see after the date last insured. (Plaintiff's Brief In Support Of Reversal Or Remand, ("Plaintiff's Brief"), at 4-6.)

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2025). The ALJ found Taylor had the residual functional capacity to perform light work, except she could never climb ladders, ropes or scaffolds; she could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; she could frequently balance; she could not work around hazards, such as unprotected heights and moving machinery, and she could not work with vibrating tools and on vibrating surfaces; she could understand, remember and carry out simple instructions, but she could not perform work requiring a specific production rate; she could occasionally interact with others; and she must be afforded the ability to sit for two hours during the workday. (R. at 22-23.)

Taylor argues the ALJ erred in his consideration of the medical opinions provided by Butler, her primary care provider, and consultative examiner Stevens. However, I am not persuaded by these arguments. Under the applicable regulations, the ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources without deferring or giving any specific evidentiary weight to any medical source. *See* 20 C.F.R. §

404.1520c(a) (2025). Specifically, the ALJ must articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. 20 C.F.R. §§ 404.1520c(a), 404.1520c(c)(1). Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered. 20 C.F.R. § 404.1520c(b)(2) (2025). When speaking of "supportability," the regulations state, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1) (2025). As for "consistency," the regulations state, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ may, but is not required to, explain how the other factors were considered. *See* 20 C.F.R. § 404.1520c(b)(2).

Taylor argues that the ALJ erred in his consideration of the medical opinions of Stevens and Butler by asserting only that these consultative examiners' "opinions are supported by objective observations, examinations, and testing." (Plaintiff's Brief at 6.)

The ALJ found unpersuasive the September 2023 opinion of consultative examiner Stevens, who found that Taylor was able to sit, walk and/or stand for a full workday; she should avoid lifting over 10 to 15 pounds; and she could hold a conversation, respond appropriately to questions and carry out and remember instructions. (R. at 964.) Stevens diagnosed low back pain with left radiculopathy,

depression and anxiety. (R. at 964.) The ALJ found Stevens's opinion was not supported by her own examination, which did not reveal any findings that suggested Taylor was limited to lifting only 10 to 15 pounds. (R. at 29.) The ALJ noted that Stevens found Taylor had normal extremities and no strength deficits. (R. at 29.) The ALJ found that the record supported a finding that Taylor was limited to a light residual functional capacity, because, while she had numerous physical impairments and testified she had pain and other symptoms, the record showed she received conservative care and typically had normal examinations. (R. at 29.) Next, the ALJ considered the May 2024 medical opinion of Butler, in which she opined Taylor could lift and carry a maximum of five pounds; she could walk and stand a total of four hours and sit a total of five hours, in an eight-hour workday; she could occasionally climb, kneel and balance; she could never stoop, crouch and crawl; she could not push and pull or operate moving machinery; and she would be unable to work on an indefinite basis. (R. at 1070-72.) The ALJ found Butler's opinion unpersuasive, stating that it was neither supported by nor consistent with the overall medical evidence of record. (R. at 29.) Similar to his analysis of Stevens's medical opinion, the ALJ explained that the record shows Taylor had no more than conservative care and often normal objective examinations, including normal gait, strength and sensation. (R. at 29.) I agree with the ALJ. For example, the ALJ cited to a May 2021 appointment with Speak, where Taylor reported difficulty with physical activity due to high blood pressure, and she reported mental health symptoms, but she denied arthritis, back problems, joint pain, joint stiffness, muscle cramps, muscle stiffness, restricted motion and weakness, among other things. (R. at 539-41.) Physical examination was normal, including gait and balance. (R. at 542.) The ALJ also referenced a February 2022 appointment with Speak, at which time Taylor similarly denied arthritis, back problems, joint pain, joint stiffness, muscle cramps and stiffness, restriction motion and weakness, and physical examination was unremarkable. (R. at 609-11.) The ALJ referred to a June 2022

appointment with Speak, where Taylor reported independence in all activities of daily living, including feeding, dressing, bathing, ambulation, shopping, meal preparation, housework, laundry and transportation. (R. at 898-99.) The ALJ discussed Taylor's August 2023 x-ray imaging, which showed degenerative and postoperative changes in the lower lumbar spine with bilateral pedicle screw placement of the L5 and S1 vertebrae with vertically oriented connecting rods; interbody prosthesis cages at the L5/S1 vertebrae; grade 1 listhesis of L5 on S1, which was unchanged, dating back to at least July 25, 2019, with grossly normal alignment otherwise; a slight compression fracture deformity and slight vertebral body height loss of T11, but the lateral view was moderately rotated, making assessment limited, although it was grossly unchanged from prior exams; there was a mild loss of disc height at L4/L5 without marked change; there was mild right and minor left arthritic changes in the SI joints; but, overall, there had not been a great deal of interval change dating back to at least July 25, 2019, the date of the comparison image. (R. at 905.) The ALJ referred to an August 2023 appointment with Speak, where Taylor denied back problems, joint pain, joint stiffness, muscle cramps and stiffness, restricted motion and weakness, and physical examination was normal. (R. at 957-59.) The ALJ also referenced a February 2024 appointment, after the date last insured, when Taylor saw Dr. Helms, her neurosurgeon, reporting back pain that had lasted for a year. (R. at 976.) Dr. Helms noted that x-rays of the lumbar spine looked stable, except for a subtle compression deformity at the T-11 vertebra, which looked chronic and was not symptomatic. (R. at 977.) During physical examination, Taylor moved all extremities; she had equal grip strength; strength was full and symmetrical; sensation was grossly intact; she had normal reflexes; Hoffman's sign was negative; straight leg raise testing was negative; she had no foot drop; and her gait was within normal limits. (R. at 977.) Dr. Helms diagnosed lumbar region radiculopathy and low back pain, and he prescribed physical therapy and oral steroids. (R. at 977.)

The ALJ properly analyzed the medical opinions of Stevens and Butler. He cited to fulsome evidence that demonstrated the medical opinions were neither supported by nor consistent with the record. For this reason, I find that the ALJ properly considered both Stevens's and Butler's opinions, and I recommend that the court find his consideration of these opinions is supported by substantial evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Taylor was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or remand the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    March 23, 2026.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE